IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 07-10117-CIV-MOORE

CELESTE BRUNO

       Plaintiff,

v.

MONROE COUNTY,

       Defendant.
_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant's Motion for Summary Judgment (dkt # 20). A Response (dkt # 27) and Reply (dkt # 31) were also filed.

UPON CONSIDERATION of the Motion, Response, Reply, and being otherwise fully advised in the premises, the Court enters the following Order.

### I.    BACKGROUND[1]

Celeste Bruno ("Bruno") is a forty-one year old woman. Bruno moved to Key West in 2000 and worked for Healthy Families Florida, an organization geared toward preventing child abuse through education. Plaintiff later obtained employment with the Monroe County Health Department, where she worked for approximately three years. While working there, the former director of county services, Louie Latour, informed Plaintiff that there was a position open as the executive assistant to Charles "Sonny" McCoy ("McCoy"), who was the mayor of Monroe County ("County"). Shortly after learning about the opening, Plaintiff met with Latour and

---

[1] These facts are predominantly taken from the deposition of Plaintiff Celeste Bruno (dkt #'s 21-2, 21-6, 21-7, 28-2). In considering Defendant's Motion for Summary Judgment, the Court must view the evidence and all factual inferences in the light most favorable to the Plaintiff. See Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

McCoy. During this initial meeting and upon seeing Plaintiff, McCoy stated "well, she certainly is pretty enough." McCoy also inquired as to Plaintiff's long-term plans and commitment to living in Key West. Following the very brief interview, Plaintiff submitted a formal application and accepted the position as McCoy's executive assistant in February 2005. Plaintiff apparently was aware of McCoy's reputation as a womanizer prior to the interview and her acceptance of the position. Two other female county employees warned Plaintiff about McCoy's penchant for making advances and engaging in unsolicited flirtatiousness.

Plaintiff states that, during her employment with Monroe County, McCoy repeated inappropriate stories of his previous sexual exploits "almost every day." These included the following:

> 1. The Mayor had an older lover when he had studied in Paris, France, who along with another woman treated the Mayor to a *menage a trois* on the eve of his leaving, the frequency and intensity of the sex that night being such that he suffered a "runny" penis and visited a physician when he got back to the United States;

> 2. The Mayor - when he was in China on an architectural/cultural trip with former President George H. W. Bush - had the sexual services of a beautiful Chinese girl "Dah ling," whose name he could remember because it sounded just like "darling";

> 3. The Mayor broke off an affair with a neighbor's wife because he had nightmares about looking up and seeing the man with a sad look on his face as he watched the Mayor and his wife have sex;

> 4. When the Mayor made his, 90-mile, one-water-ski trip to Cuba -- a claim-to-fame he has memorialized with a wall of photographs in his office -- there were women on the ski boat whose sole function was to "keep me up" by periodically appearing at the stern and removing an article of clothing;

> 5. The Mayor developed an aversion to overweight women while working as a cargo pilot when one such women initiated sex with him after he passed out drunk;

> 6. The Mayor officiated at a wedding as Key West mayor, and then had sex with the bride after the groom got too drunk at the reception; and

2

7. The Mayor had sex with Cuban prostitutes when doing architectural work in Cuba. Compl. ¶ 12. Plaintiff also states that McCoy would do the following: compliment her buttocks, tell her she was cute and attractive, ask about her sex life with her husband, say that he wanted to slap her buttocks, ask if she was attracted to him, inquire about the color of her underwear, proclaim that he had a very high semen count for a man his age, and call her into his office just to comment on her looks. In addition, McCoy allegedly attempted to give Plaintiff unwelcome gifts in the form of an appliance and free home improvement.

McCoy began to demean her work and embarrass her in front of other employees, and he would repeatedly tell her, "you're cute when you're upset." During one particular incident, McCoy laughed as Plaintiff became frustrated about a letter she was working on for McCoy. Plaintiff ultimately felt that she had endured enough and left McCoy's office. Following her departure from McCoy's office, Plaintiff relied on unused vacation time and unpaid leave while finding another position.

Plaintiff obtained a position within the County's personnel department, but ultimately took a job with County Commissioner Spehar. After news of Plaintiff's complaints to the Equal Employment Opportunity Commission had been published, Milo John Reese left a note at Spehar's office that appeared to threaten Plaintiff. Reese, who also claimed to be a friend of McCoy's, later showed up at Spehar's office on a subsequent occasion, after which the Key West Police issued a trespass warning against Reese and told Plaintiff to press her panic button if Reese showed up again. On November 30, 2006, Reese again returned to Spehar's office. Although Plaintiff pressed the panic button as instructed, no Monroe County Sheriff's deputies responded. Plaintiff also dialed 9-1-1 to summon the Key West police, who responded and

apprehended Reese for violating the trespass order. Plaintiff was concerned as to why the Monroe County Sherriff's deputies had not responded and felt that Monroe County could not keep her safe. Consequently, Plaintiff, on the advice of her psychotherapist, did not return to work at Spehar's office. Plaintiff's failure to return to work eventually led Monroe County to terminate her employment based on abandonment.

## II.     STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Id. (internal quotation marks omitted). In applying this standard, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. See Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

"The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an

absence of any genuine issue of material fact." Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993). However, the nonmoving party

> may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.

Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

This general summary judgment standard applies, without modification, in employment discrimination cases. The Supreme Court and the Eleventh Circuit have made this abundantly clear:

> While acknowledging that questions of fact in job discrimination cases are "both sensitive and difficult" . . . the Supreme Court has told us that "none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact." And quite recently, the Court rejected a rule which would have made it easier for job discrimination plaintiffs to get their case to a jury, explaining that "[t]o hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." The long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale.

Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000) (internal citations omitted).

### III. DISCUSSION

Plaintiff's Complaint (dkt # 1) sets forth six counts against Monroe County. Count one alleges that the Defendant, via McCoy's actions, violated 42 U.S.C. § 2000e-2(a), which prohibits sex discrimination in the workplace. Plaintiff's next claim alleges sex discrimination under the Florida Civil Rights Act, which parallels 42 U.S.C. § 2000e. See Fla. Stat. Ann. §

760.10 (West 2008). The remaining four counts of Plaintiff's Complaint alleged retribution and failure to protect under federal and state statutes; however, these four counts have been voluntarily dismissed (dkt # 36).

A. TITLE VII

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A Title VII sex discrimination claim may be based on either a tangible employment action or the "creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work." Reeves v. C.H. Robinson Worldwide, Inc., 525 F.3d 1139, 1143 (11th Cir. 2008) (internal quotation marks omitted). More specifically, a plaintiff must prove these elements in order to establish a hostile work environment:

> (1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment; (3) the harassment was based on her membership in a protected group; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment; and (5) a basis for holding the employer liable.

Id.

The County argues that it is entitled to summary judgment for two reasons: (1) because Bruno has failed to satisfy element four, and (2) because the County is entitled to an affirmative Faragher defense. In particular, the County contends that any harassment was not, under an objective standard, "sufficiently severe or pervasive" to make out a claim under Title VII. Also, the County claims that the Faragher affirmative defense applies because Bruno acted unreasonably by not following County procedures for reporting sexual harassment. For the reasons that follow, the Court concludes that a reasonable jury could find that Bruno was subject

6

to a hostile work environment. A reasonable jury could also find that Bruno's failure to follow the County's harassment policy reporting procedures was reasonable. Thus, because genuine issues of material fact exist, the Court denies Defendant's Motion for Summary Judgment (dkt # 20).

1. "Severe or Pervasive"

The "severe or pervasive" element is satisfied "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult." Harris v. Forklift Systems, Inc., 510 U.S.17, 21 (1993); Reeves, 525 F.3d at 1145. Although the inquiry is "somewhat fact-intensive," Reeves, 525 F.3d at 1145, the U.S. Supreme Court has identified four factors to guide the analysis:

> (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.

Id. at 1145-46 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).

"Importantly, no single factor is determinative and either severity or pervasiveness can satisfy the element, if sufficient." Reeves, 525 F.3d at 1146 (emphasis in original).

a. Frequency

According to Bruno, McCoy subjected her to sexually inappropriate stories "almost every day." Bruno Dep. 82:1. Although the County argues that the alleged conduct fails to satisfy the objective legal requirements, Def.'s Sum. J. Mem. 4-8 (dkt # 23), the County has not denied that McCoy acted as Plaintiff alleges, nor has it pointed to any evidence refuting Bruno's account. Accordingly, this factor clearly weighs in Bruno's favor. Cf. Reeves, 525 F.3d at 1146.

b. Severity

It appears, based on the evidence, that the words McCoy used were not particularly vulgar, especially in comparison to those discussed in Reeves, 525 F.3d at 1146. Examination of the precise words, however, should not completely overshadow the content of what is being communicated. McCoy's vocabulary may be more refined than that addressed in Reeves, but the subject matter of his comments was graphic and offensive nonetheless, and certainly outside the bounds of the 2005 contemporary workplace environment. McCoy's stories of his sexual exploits, inquiries into the color of Bruno's underwear, comments about her buttocks, and other inappropriate actions, were exceedingly invasive and inappropriate. Def.'s Facts ¶ 17 (dkt # 22); Pl.'s Facts ¶¶ 13-18 (dkt # 28). Although it seems that McCoy's comments mostly (though not exclusively) concerned women other than Bruno, the comments were directed at her in the sense that McCoy was speaking directly to her -- indeed, McCoy and Bruno were often the only people in the room. Accordingly, at the summary judgment stage, this factor weighs in favor of Bruno.

c. Physically Threatening or Humiliating

Bruno was not physically threatened.[2] However, a reasonable jury could find that "a woman in [Bruno's] position would have felt humiliated." Reeves, 525 F.3d at 1147. Unlike the plaintiff in Reeves, who was "the only woman in the workstation pod," id., Bruno was often the only other person in the room. This created an intimate environment where the humiliating conduct was clearly aimed directly at Bruno. This factor weighs in favor of Bruno.

d. Unreasonable Interference with Job Performance

Monroe makes the claim that because Bruno received positive performance reviews, she

---

[2] Since Plaintiff's Response failed to point to any evidence demonstrating why the County should be liable for Reese's actions, the Court does not consider his conduct relevant to this decision.

8

must not have been subjected to a hostile work environment, or at least any harassment was not severe enough to affect her work performance. Def.'s Mem. 7-8. However, in Reeves,, the Eleventh Circuit rejected exactly this line of argument, noting that "the conduct in question need not have tangibly affected the plaintiff's job performance." Reeves, 525 F.3d at 1147 (citing Harris, 510 U.S. at 22). In Reeves, the court went on to state that this factor weighs in favor of the employee where, *inter alia*, "the conduct made it difficult to concentrate on work."

McCoy's harassment arguably had an even greater interference with job performance than that contemplated in Reeves. In addition, many of McCoy's inappropriate and offensive remarks were related, at least superficially, to Bruno's job performance. Pl.'s Facts ¶¶ 17-18 (stating McCoy "belittled Bruno's work" and his "disgusting stories . . . made Bruno uncomfortable and . . . made it difficult to concentrate"). This factor weighs in favor of Bruno.

   e. Court's Determination

Considering the four factors "in light of the totality of the circumstances," this Court concludes that "a reasonable jury could find that the harassment . . . was sufficiently pervasive to alter the conditions of [Bruno's] employment." Reeves, 525 F.3d at 1147. It is not necessary that a single incident was so severe as to cross the Title VII threshold. See id. (quoting Williams v. Gen. Motors Corp., 187 F.3d 553, 564 (6th Cir. 1999)). Indeed, it is the pervasiveness and not the severity of the harassment that pushes Bruno's claim over the summary judgment hurdle. While McCoy's conduct was, of course, inappropriate, what truly separates it from the "ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing," is the frequency with which it occurred. Id. (internal quotation marks omitted) (emphasis added).

9

In <u>Reeves</u>, the Eleventh Circuit pointed to two cases from sister circuits that illustrate how relatively mild conduct can satisfy the "severe or pervasive" element if done with sufficient frequency. 525 F.3d at 1148. In <u>Dominguez-Curry v. Nevada Transportation Department</u>, 424 F.3d 1027, 1035 (9th Cir. 2005), the plaintiff's supervisor allegedly told sexually explicit jokes "like everyday" and repeatedly told the plaintiff that, as a woman, she was not capable of doing work that required a man. The Ninth Circuit thus reversed the district court's order granting summary judgment in favor of the defendants. <u>Id.</u> In <u>Lauderdale v. Texas Department of Criminal Justice</u>, 512 F.3d 157 (5th Cir. 2007), the harassment took the form of multiple nightly phone calls over a span of nearly four months. Even though the most explicit call was merely an invitation to "snuggle" in Las Vegas, the Fifth Circuit overturned an order granting summary judgment because the calls were so frequent. <u>Id.</u> at 164.

    2. <u>Faragher</u> Defense

        a. Legal Standard

In <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998), and <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998), the Supreme Court articulated an affirmative defense available to employers in certain employment discrimination cases. Adopting common law agency principles, the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." <u>Faragher</u>, 524 U.S. at 807. The Court also held, however, that "[w]hen no tangible employment action is taken," an employer may avoid liability by proving: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee

unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. The Court then explained the role of the employer's antiharassment policy:

> While proof that an employer had promulgated an antiharassment policy with [a] complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

Id. at 807-08. As an affirmative defense, "the defendant bears the burden of proof on both elements." Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1313 (11th Cir. 2001).

"[I]n order to establish that it took reasonable steps to prevent harassment, [an employer is] required to show that its sexual harassment policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect." Id. at 1314. In other words, the effectiveness of a harassment policy must be determined not simply by its words, but by the rigor with which it is implemented. "[A] policy must be found ineffective when company practice indicates a tolerance towards harassment or discrimination." Miller v. Kenworth of Dotham, Inc., 277 F.3d 1269, 1280 (11th Cir. 2002). However, "once a company has developed and promulgated an effective and comprehensive anti-sexual harassment policy, aggressively and thoroughly disseminated the information and procedures contained in the policy to its staff, and demonstrated a commitment to adhering to this policy, it has fulfilled its obligation to make reasonably diligent efforts to 'know what is going on' within the company." Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).

Determining the reasonableness of an employee's failure to follow a harassment policy's reporting procedures requires a careful examination of the facts. However, "a generalized fear of retaliation," accompanied by "no objective evidence to substantiate [that] fear," is, as a matter of law, insufficient to justify a failure to comply with a reporting policy. Howard v. City of Robertsdale, 168 Fed. Appx. 883, 888 (11th Cir. 2006) (unpublished).

b. Analysis

Monroe County contends that it has proven both prongs of the Faragher affirmative defense. The County states that it had an effective harassment policy in place. It notes that Bruno received a copy of the County's harassment policy, and that the policy defined harassment, asked employees to promptly report any instances of harassment, and provided multiple avenues through which to make such a report. Def.'s Facts ¶¶ 14-16. Furthermore, once Bruno reported the harassment, she was transferred to a new position away from McCoy with approximately the same pay and was never harassed by McCoy again. Def.'s Facts ¶ 30. According to the County, this demonstrates that the County took prompt and effective measures to prevent harassment and that Bruno's failure to make a timely report pursuant to the harassment policy procedures was thus unreasonable.

Bruno responds by claiming that the County's policy was ineffective for a number of reasons. She argues that the policy was ineffective because it did not apply to elected officials, such as McCoy.[3] Pl.'s Response 13-15 (dkt # 27); Pl.'s Facts ¶¶ 9-10. She also contends that the County failed to enforce the policy and instead tolerated harassment -- and that this toleration of

---

[3] In reply, the County explains that, under the Florida Constitution, it lacks the power to remove an elected official. Def.'s Reply 7 (dkt # 31).

harassment reasonably led her to believe that any complaint she made would be futile and would likely trigger retaliation. For example, with varying degrees of certainty, County employees had known "for years" of McCoy's habit of making sexual remarks and acting unprofessionally towards women. See Pl.'s Facts ¶ 7, 8-11. Although the County's policy forbids County employee's from engaging in sexual harassment, County Attorney Suzanne Hutton stated that "[t]here is no specific language in our policy that addresses [whether anyone] has the ability to tell any county commissioner [such as McCoy] to cease behaving in any sort of way toward any employee." Pl.'s Facts ¶ 9. Indeed, Bruno notes that former County Attorney Richard Collins admitted that neither a county attorney nor a county administrator could safely tell McCoy that his conduct towards female assistants was inappropriate. Pl.'s Facts ¶ 11. Furthermore, Collins stated that McCoy was "all powerful" and "a law unto himself," and that an attempt to control McCoy's conduct "would have been fruitless, and it would have probably jeopardized the county administrator's position." Pl.'s Facts ¶ 11.

In addition, Bruno's reluctance to file a complaint was heightened by fear of receiving the same treatment as her predecessor, Kathy Peters. In her deposition, Bruno stated that an anonymous letter came to McCoy's office accusing McCoy of sexually harassing Peters. McCoy then

> took the letter over to the County Attorney, who was at that time Richard Collins, and when he returned . . . he told me that Richard took [K]athy into an office, sat her down while McCoy was standing outside and asked her repeatedly if she had anything to do with the letter or if it were true.

Bruno Dep. 104:5-19. Following his exchange with Peters, Collins sent out two notices stating that the allegations regarding McCoy and Peters were not true. In his deposition, Collins stated

that the second communication was sent out because McCoy "apparently was not satisfied with my first letter . . . and indicated to me at some point that there was more rumors going around other than the anonymous letter of why Miss Peters had transferred ." Collins Dep. 26:15-22. It appears that Collins' own employment with the County was eventually terminated by McCoy. Bruno Dep. 138.

### c. Conclusion

This Court concludes that Bruno's evidence is sufficient to create a genuine issue of material fact as to the Faragher defense. Regarding the effectiveness of the County's harassment policy, Bruno has produced enough evidence, such as the testimony of former County Attorney Collins, to raise a genuine issue as to whether the County tolerated sexual harassment. Similarly, Bruno's evidence regarding the reasonableness of her failure to follow the County's harassment reporting policy procedures points to more than "a generalized fear of retaliation." Thus, it is also sufficient to raise a genuine issue of fact.

In addition, it is important to note that resolving conflicts between the testimony of different witnesses requires making credibility determinations. Such determinations are to be reserved for the jury and are inappropriate for resolution at the summary judgment stage. For example, in Frederick, the Eleventh Circuit addressed a similar scenario and noted there were "factual disputes about . . . extenuating circumstances that might explain why Frederick failed to timely use the complaint procedures." 246 F.3d at 1316. The plaintiff in Frederick argued that, inter alia, "she did not timely file her complaint in accordance with [the] policies because [a co-worker] told her not to pursue her complaint." Id. In overturning the district court's order granting summary judgment, the court noted that "[i]mportantly, the facts relevant to Frederick's

conversation with [the co-worker] turn on assessments of witness credibility, which by definition cannot be resolved at summary judgment." Id. Bruno similarly contends that she was dissuaded from following reporting policy procedures because of, *inter alia*, comments by co-workers -- and, similarly, the validity of Bruno's contentions depend on assessments of witness credibility.

### B. FLORIDA CIVIL RIGHTS ACT

As the Florida Civil Rights Act tracks Title VII, summary judgment is denied as to Count II for the reasons stated above. See Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) ("The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII.") (collecting cases).

### IV. CONCLUSION

For the forgoing reasons, it is

ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (dkt # 20) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this /6th day of September, 2008.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:   All Counsel of Record